# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: | |
| SUNSET HOLLOW PROPERTIES, LLC., | Chapter 11<br>Case No. 05-46066-HJB |
| Debtor. | |
| SUNSET HOLLOW PROPERTIES, LLC., | |
| Plaintiff, | Adversary Proceeding<br>No. 06-04097 |
| v. | |
| THE BANK OF WESTERN MASSACHUSETTS, JOHN KOKOSKI and PAUL A.L. MANNHEIM, | |
| Defendants. | |

## MEMORANDUM OF DECISION

The parties here can not agree on the appropriate distribution of proceeds realized from the post-petition sale of real property of the debtor, Sunset Hollow Properties, LLC. ("Sunset Hollow"). The heart of the controversy is the extent to which a second mortgage on that property, held by defendants John Kokoski and Paul A.L. Mannheim ("Kokoski" and "Mannheim" separately, "K&M" jointly), is subordinated to a first mortgage, held by the Bank of Western Massachusetts (the "Bank") - if at all. There are three related motions pending before the Court: 1) the "Motion of the Bank of Western Massachusetts for

Summary Judgment" (the "Motion for Summary Judgment"); 2) the "Defendants John Kokoski and Paul A.L. Mannheim's Motion to Dismiss Cross-Claims of Official Committee of Unsecured Creditors for N&B Express" (the "Motion to Dismiss Cross-claims")[1]; and 3) the "Joint Motion to Approve Stipulation Authorizing Official Committee of Unsecured Creditors of N&B Express, Inc. to Prosecute Certain Claims of Behalf of the Estates of N&B Express, Inc., Sugarloaf Leasing Corporation and Sunset Hollow Properties" (the "Stipulation").   Defendants K&M oppose both the Motion for Summary Judgment and approval of the Stipulation.   The Official Committee of Unsecured Creditors of N&B Express, Inc. (the "Creditors' Committee") opposes the Motion to Dismiss Cross-claims.

## I.      FACTS & TRAVEL OF THE CASE

The following are the undisputed material facts submitted by the parties.   Prior to February of 2000, N&B Express, Inc. ("N&B Express") and Sugarloaf Leasing Corporation ("Sugarloaf Leasing")[2] operated together as an over-the-road common carrier business. Sugarloaf Leasing owned the rolling stock and N&B Express conducted the business operations.   During that period, the two entities were under the common ownership and control of defendants K&M and operated out of real estate located at 20 Industrial Drive in South Deerfield and Whately, Massachusetts (the "Real Property"), also owned by K&M.

---

[1]  N&B Express, Inc. is a debtor in a separate, but related, bankruptcy case.

[2]  Sugarloaf Leasing was formerly known as J&P Leasing Corp. and various relevant documents refer to that entity by its former name.  For the sake of simplicity, this Court will refer to this entity exclusively as Sugarloaf Leasing, despite the fact that some events may have transpired while it was operating under the name J&P Leasing Corp.

On or before February 1, 2000, Sunset Hollow, through its principals, James Cappelli ("Cappelli") and Peter Mannheim (jointly, the "Principals"), acquired the Real Property from K&M.  At that time, Sunset Hollow also purchased the combined assets of N&B Express and Sugarloaf Leasing (this purchase, together with the purchase of the Real Property, hereinafter referred to as the "Acquisition").  The common carrier business operations of N&B Express, the rolling stock owned by Sugarloaf Leasing, and the Real Property were acquired as a unit; however, the three entities remained autonomous, despite the common ownership and control of the Principals.

The Acquisition was financed primarily by the Bank.  The $1,300,000.00 purchase price for the Real Property was financed with a  $700,000.00 loan from the Bank and $600,000.00 of take-back seller financing from K&M.  A Commercial Mortgage Note (the "Note"), executed on February 1, 2000, obligated Sunset Hollow to the Bank for the $700,000.00 loan.  The Note was secured by a mortgage evidenced by a Commercial Mortgage and Security Agreement (the "First Mortgage"), recorded by the Bank on February 2, 2000 in the appropriate registry of deeds.  Sunset Hollow's obligation to K&M was secured by a mortgage evidenced by a Mortgage and Security Agreement (the "Second Mortgage"), also recorded on February 2, 2000, but after the First Mortgage was recorded.

Two other documents, the Subordination and Standby Agreements - the cornerstones of the current contest - were executed on February 1, 2000.  Those documents were identical in all respects except that the parties to one were Sunset Hollow, the Bank, and Kokoski, and to the other, Sunset Hollow, the Bank, and Mannheim (these two agreements hereinafter referred to jointly as the "Subordination Agreement").  Because

-3-

the outcome of the matters before the Court turns almost exclusively on the interpretation

of the four documents executed on February 1, 2000 (the Note, the First Mortgage, the

Second Mortgage, and the Subordination Agreement), the particulars of each are detailed

in turn.

The promise to repay the Bank for Sunset Hollow's primary obligation of

$700,000.00 is memorialized by the terms of the Note.   The Note incorporates by

reference, *inter alia*, the First Mortgage, and its terms cast a wide net over other

instruments that secure (or guaranty) Sunset Hollow's promise under the Note:

> This Note is secured by a first mortgage and security agreement on the [Real
> Property], a collateral assignment of leases and rents on said premises, the
> unlimited guaranty of each of James Cappelli, Constance Cappelli, Peter
> Mannheim, Paul Kokoski, Tami J. Kokoski, N&B Express, Inc., [Sugarloaf
> Leasing] Corp. and any other instruments, now or hereafter executed by
> [Sunset Hollow] in favor of [the Bank], which in any manner constitute
> security for this Note, which together with this Note are referred to as the
> "Loan Documents."

The Note mandates that Sunset Hollow's obligation to the Bank thereunder be

construed as part and parcel to its obligations to the Bank under the other "Loan

Documents," as that term is defined above.

> The rights or remedies of [the Bank] as provided in this Note and in the Loan
> Documents shall be cumulative and concurrent, and may be pursued
> singularly, successively or together against any Guarantor hereof and any
> other funds, property or security held by [the Bank] for the payment hereof
> or otherwise at the sole discretion of [the Bank].

The Note further provides that "the liabilities of [Sunset Hollow] and any endorser or

guarantor of this Note are joint and several."

In addition to securing the Note, the First Mortgage secures various guaranties of

Sunset Hollow for other and separate obligations that were incurred by N&B Express,

-4-

Sugarloaf Leasing, and Cappelli in furtherance of the Acquisition (collectively, with the obligations under the Note, the "Acquisition Obligations").[3]  The Acquisition Obligations are all cross-collateralized and cross-guaranteed.[4]   The First Mortgage secures:

> the obligations of [Sunset Hollow] in favor of [the Bank], including but not limited to; (I) a Commercial Mortgage Note in the original principal amount of [$700,000.00][;] (ii) the obligations of [Sunset Hollow] under a certain guaranty of even date in favor of [the Bank] relative to the obligations of N&B Express, Inc. to [the Bank]; (iii) the obligations of [Sunset Hollow] under a certain guaranty of even date in favor of [the Bank] relative to the obligations of [Sugarloaf Leasing] to [the Bank]; and also to secure the performance of all agreements and conditions herein contained and all other obligations now existing or hereafter arising of [Sunset Hollow] to [the Bank], direct or indirect, absolute or contingent.[5]

It also contains a dragnet clause, which states, in relevant part:

> It is the intention of [Sunset Hollow] that the continuing grant of this Mortgage remain as security and as collateral, for payment and performances of the [o]bligations whether now existing, or which may hereinafter be incurred by future

---

[3] According to a Forbearance Agreement dated April 29, 2004, discussed *infra*, the following amounts and types of debt comprised the Acquisition Obligations incurred by the respective primary obligors on February 1, 2000:

- Sunset Hollow - a $700,000.00 loan for the purchase of the Real Property;
- N&B Express - a $300,000.00 Revolving Line of Credit Note;
- Sugarloaf Leasing - a $300,000.00 Fixed Asset Line of Credit Note and Agreement; and
- James Cappelli - a $1,475,000.00 Commercial Term Note.

[4] None of the parties to these contested motions provided the Court with a copy of any of the guaranties, or with any other relevant documentation relating thereto, beyond what is evident from the terms of the First Mortgage and the April 29, 2004 Forbearance Agreement.

[5] While the First Mortgage expressly includes the obligations of N&B Express and Sugarloaf Leasing that are guaranteed by Sunset Hollow, the Commercial Term Note under which James Cappelli is liable to the Bank (the "Cappelli Personal Loan") is not specifically referenced.  The parties to the relevant documents agreed under the Forbearance Agreement that the Cappelli Personal Loan was guaranteed, in part, by an unlimited guaranty of Sunset Hollow.  Because the parties have not suggested otherwise, this Court will assume that the parties intended the First Mortgage to secure the Sunset Hollow guaranty of the Cappelli Personal Loan through its catch-all phrase "including but not limited to. . ." prior to the description of the obligations secured thereunder.

advances, or otherwise; and whether or not the [o]bligations are related to the transaction described in this mortgage, by class, or kind, or whether or not contemplated by the parties at the time of the granting of this Mortgage.

The Second Mortgage secures Sunset Hollow's liability to K&M for the balance of the Real Property sale price not covered by the Bank's loan.[6]  At the outset, the Second Mortgage sets forth the amount of the mortgage, $600,000.00, describes the Real Property, and recites that Sunset Hollows "does hereby grant a security interest to [K&M]. . . subject to a first mortgage to the Bank of Western Massachusetts of even date (the 'First Mortgage')."  The Second Mortgage is in all other respects a standard mortgage document; however, its priority *vis-a-vis* the First Mortgage is again addressed in an independent clause, which provides in its entirety:

> First Mortgage Rights.  Notwithstanding any provision herein to the contrary, it is acknowledged that [K&M's] rights are subject to the rights under the First Mortgage.

K&M, together with the Bank and Sunset Hollow, executed the Subordination Agreement on February 1, 2000, but this agreement was not recorded with the First and Second Mortgages on February 2, 2000, or on any other date thereafter.  The expressly stated purpose of the Subordination Agreement was "to induce [the Bank] to make or continue  loans from time to time, and in consideration of A [sic] loan made or to be made or continued by [the Bank] to [Sunset Hollow] under [the Note]."  Sunset Hollow's obligation to the Bank under the Note is referred to, in the Subordination Agreement, as the "Senior

---

[6] More specifically, the Second Mortgage secures Sunset Hollow's liability to K&M as evidenced in a promissory note dated February 1, 2000; however, the terms of that note, having never been presented to the Court, are not herein relayed or interpreted.

Debt." The Subordination Agreement sets forth a number of ways in which it benefits the

Bank, to the detriment of K&M.

> [Kokoski/Mannheim] hereby subordinates any and all claims now or hereafter
> owing to the [Bank] by [Sunset Hollow] under a certain Promissory Note of
> even date in the amount of [$600,000.00]. . . to any and all indebtedness of
> [Sunset Hollow] to the [Bank] arising under a Commercial Mortgage Note in
> the amount of [$700,000.00].

In anticipation of an event of default, including the filing of a bankruptcy petition by Sunset

Hollow, the Subordination Agreement requires:

> In any. . . bankruptcy. . . the Senior Debt shall be paid in full before any
> payment is made to [Kokoski/Mannheim], whether such payment is in kind
> or in cash.  The fund out of which the [Bank's] claim is to be paid shall be
> subject to a security interest in the [Bank's] favor to secure this agreement
> of subordination, and [Kokoski/Mannheim] and [Sunset Hollow] agree that the
> [Bank] may collect [Kokoski/Mannheim's] claim directly from the trustee in
> such proceeding if necessary to provide for the payment in full of [the Bank's]
> claim.

Additionally, the Subordination Agreement sets forth certain actions that K&M agreed not

to take, such as the sale, assignment or transfer of their claims against Sunset Hollow.

K&M also agreed not "to take any lien or security on any of [Sunset Hollow's] property at

any time when the [Bank] has a claim or claims against [Sunset Hollow] other than a

second mortgage on [Sunset Hollow's] real estate. . . which mortgage is subject to a senior

mortgage to the [Bank]."

At some point, each of the parties primarily liable under the Acquisition Obligations

defaulted on their respective obligations to the Bank.  On April 29, 2004, in order to stave

off foreclosure, Sunset Hollow, N&B Express, Sugarloaf Leasing, James and Constance

Cappelli, and Peter and Heather Mannheim (collectively, the "Obligors") entered into a

Forbearance Agreement with the Bank.  The Bank agreed to forbear from enforcing its

rights against the Obligors and the Obligors, in exchange, "ratifie[d] and affirm[ed]. . . their respective obligations" to the Bank and, further, "agree[d] that they [were] jointly and severally liable for the payment and performance" of the obligations to the Bank.  The obligations to the Bank, as described in the Forbearance Agreement, included the Acquisition Obligations, as well as subsequent extensions of credit from the Bank to N&B Express and Sugarloaf Leasing.  Like the Subordination Agreement, the Forbearance Agreement was never recorded.

On September 2, 2005, Sunset Hollow, N&B Express, and Sugarloaf Leasing (collectively, the "Related Debtors") each filed for protection under Chapter 11 of the Bankruptcy Code.[7]  The cases have not been substantively consolidated.[8]  The Related Debtors then proceeded to liquidate their assets.  As part of this process, Sunset Hollow filed a motion for authority to sell the Real Property.  That motion contemplated payment to the Bank, in full, for Sunset Hollow's obligations under the First Mortgage.  K&M opposed the motion to sell.  They argued that the Subordination Agreement, which *expressly* references only the principal amount of $700,000.00 owed to the Bank under the Note, subordinated the balance of the Bank's claim under the First Mortgage to the Second Mortgage.

On January 18, 2006, this Court authorized Sunset Hollow to sell the Real Property for $1,305,000.00 without ruling on the appropriate distribution of the proceeds from the

---

[7] Unless otherwise stated, all statutory references are to Title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code" or the "Code").

[8] N&B Express is filed under case number 05-46064-HJB; Sugarloaf Leasing is filed under case number 05-46065-HJB.

sale (the "Proceeds").   After the sale was conducted, Sunset Hollow filed a motion to distribute the Proceeds.   On February 27, 2006, this Court ordered Sunset Hollow to disburse the undisputed amount of $700,000.00 to the Bank.   Because of the ongoing disagreement over the manner in which to distribute the balance of the Proceeds, Sunset Hollow was further ordered to "file an interpleader action with respect to the remaining claims on the proceeds" and the Creditors' Committee was granted "leave to intervene as party defendant."

On March 30, 2006, Sunset Hollow filed the instant adversary proceeding against K&M and the Bank, and seeks a determination as to the rights to the Proceeds.   Pursuant to the February 27 order, the Creditors' Committee intervened as a party-defendant and took the opportunity to bring various cross-claims against K&M with its Answer.   In June of 2006, the Bank's Motion for Summary Judgment and K&M's Motion to Dismiss Cross-claims were filed and a hearing on both motions was set for September 13, 2006.[9]

On September 7, 2006, the Creditors' Committee also filed a motion to approve a Stipulation between the Creditors' Committee, N&B Express, Sunset Hollow, and Sugarloaf Leasing.[10]   The Stipulation authorizes the Creditors' Committee to prosecute, on behalf of *each* of the Related Debtors, "any claims, causes of action and/or choses in action against present or former insiders of the [three related debtors] (as that term is defined by the

---

[9] As of June 14, 2006, the date that the Motion for Summary Judgment was filed, the Bank claimed to be owed by Sunset Hollow, as guarantor of obligations owed by N&B Express and James Cappelli, $1,019,338.72, plus accruing interest, costs, late fees, and attorneys' fees. K&M filed a proof of claim against Sunset Hollow in the amount of $754,723.59.

[10] The Related Debtors are all represented by the same counsel.

Bankruptcy Code)."[11] The Stipulations specifically identifies as "Insiders": Constance Cappelli, James Cappelli, John Kokoski, Paul Kokoski, Tami Kokoski, Heather Mannheim, Paul Mannheim and Peter Mannheim.

At the September 13, 2006 hearing, the Motion to Dismiss Cross-claims and the Motion for Summary Judgment were heard and taken under advisement. Subsequent to that hearing, on September 18, 2006, K&M filed an objection to the pending motion to approve the Stipulation. As it relates to the Motions to Dismiss Cross-claims and for Summary Judgment, and since arguments for and against the material terms of the Stipulation were heard on September 13, 2006, the contested motion to approve the Stipulation was taken under advisement without a further hearing.

## II.    POSITIONS OF THE PARTIES

### A.    Motion for Summary Judgment

Sunset Hollow filed this adversary proceeding to establish a forum for the defendants to present their respective arguments as to the distribution of the Proceeds. However, K&M had initiated this controversy prior to the adversary proceeding in their objection to Sunset Hollow's motion to sell the Real Property, which had provided, in turn,

---

[11] The term "insider," where the debtor is a corporation, includes any:

    (I) director of the debtor;
    (ii) officer of the debtor;
    (iii) person in control of the debtor;
    (iv) partnership in which the debtor is a general partner;
    (v) general partner of the debtor; or
    (vi) relative of a general partner, director, officer, or person in control of the debtor.

11 U.S.C. § 101(31)(B).

for full payment of Sunset Hollow's obligations to the Bank under the First Mortgage. Because K&M's arguments here reiterate those made in opposition to the sale of the Real Property, the Motion for Summary Judgment is really a response to their original arguments. As such, the positions taken by the parties in support of and in opposition to the Motion for Summary Judgment are set forth in reverse order.

K&M contend that on February 1, 2000, the date of the Acquisition, the Bank and K&M agreed that the Second Mortgage would be subordinated to the First Mortgage only to the extent of the $700,000.00 owed under the Note - and submit as evidence for that proposition the Subordination Agreement, which refers only to that debt owed on the Note that was used to purchase the Real Property. From this they surmise that the Subordination Agreement actually subordinated the First Mortgage, beyond the amount of $700,000.00, to the Second Mortgage. K&M maintain that the Subordination Agreement was actually "negotiated to protect K&M from this exact situation i.e. [the Bank] claiming that all of its debt owed is superior to K&M's promissory note on the Real [Property]."

K&M point to a letter that the Bank mailed to Mannheim on March 12, 2002 (the "Letter"), which solicited his signature and provided, in relevant part:

> By signing below you hereby agree to subordinate any and all claims now or hereafter owing to you by [Sunset Hollow, N&B Express, Sugarloaf Leasing, and Peter Mannheim], whether or not such claims are evidenced by a note, consulting agreement or other evidence of indebtedness, to any and all indebtedness of [Sunset Hollow, N&B Express, Sugarloaf Leasing, and Peter Mannheim] to the [Bank] whether now existing or arising in the future, (hereinafter referred to as the "Senior Debt") and agree that all Senior Debt shall be paid in full before any payment may be made on the debt of [Sunset Hollow] whether of principal or interest.

-11-

They view this letter as evidence that the entirety of the First Mortgage did not originally have first priority over the Second Mortgage, and as an attempt by the Bank to subordinate K&M's otherwise first priority position.

Alternatively, K&M argue that the doctrine of marshaling would be appropriately invoked here, as the Bank also holds a first security interest on personal property belonging to N&B Express and Sugarloaf Leasing.  K&M maintain that such property should be used to satisfy the primary obligations of N&B Express and Sugarloaf Leasing before the Bank looks to the assets of the guarantor, Sunset Hollow.  K&M additionally claim that the Bank has control over accounts receivable and a checking account held by N&B Express, and that those funds should also be used to satisfy the primary obligations of N&B Express to the Bank.

In response, the Bank submits that the Subordination Agreement "relate[s] only to priority of payments and relative rights to receive those payments [upon default], not to [the priority of] any security interests or mortgage liens which may secure the various obligations."  It contends that the Subordination Agreement serves to represent the agreement of the parties that, in the event of default, K&M would not be entitled to any regular payments on their claim against Sunset Hollow until the Bank was paid in full on the $700,000.00 Note - but that regardless of the Subordination Agreement, the Bank's position as first mortgagee was not compromised.  If the Real Property was to be liquidated, the Bank would be entitled to prior payment on all of the obligations represented by the First Mortgage.

With respect to K&M's marshaling claim, the Bank notes that Sunset Hollow expressly waived all marshaling rights in the First Mortgage and, since K&M took the

Second Mortgage subject to the provisions of the First, K&M's mortgage was taken subject to that waiver.  The Bank further maintains that marshaling would be inappropriate, even absent the waiver in the First Mortgage.  It asserts that the "common debtor" requirement, necessary to invoke the doctrine of equitable marshaling, is not satisfied.

B.    The Stipulation and the Motion to Dismiss Cross-claims

The Creditors' Committee of N&B Express maintains that it has standing to pursue claims on behalf of any of the Related Debtors' estates for two reasons.  First, it asserts that it has standing pursuant to this Court's order of February 27, 2006, which provides that "the Creditors' Committee shall have leave to intervene as a party defendant."  Second, the Creditors' Committee contends that the estate of N&B Express, as a guarantor of the First Mortgage, has contingent claims against the estate of Sunset Hollow and, accordingly, has standing as a creditor party-in-interest, pursuant to the Bankruptcy Code.

> A party in interest, including. . . a creditor. . . may raise and may appear and
> be heard on any issue in a case under this chapter.

11 U.S.C. § 1109(b).  The Creditors' Committee maintains that, as representative of the estate of a creditor of Sunset Hollow, it has standing under § 1109(b) to raise its cross-claims against K&M.

The Creditors' Committee notes further that a potential conflict of interests exists between the Related Debtors and the Insiders, defined *supra*.  To that end, the Committee submits that it is in the overall best interest of all of the debtors that it prosecute, on behalf of Sunset Hollow, N&B Express, and Sugarloaf Leasing, all claims that any may have against the Insiders.

-13-

K&M object to the Stipulation on the grounds that the N&B Creditors' Committee represents only the unsecured creditors of N&B Express, and the estates of Related Debtors have not been consolidated.  K&M maintain that while involvement of the Creditors' Committee might benefit the estate of N&B Express, there is no benefit to the estate of Sunset Hollow and, indeed, no unsecured proofs of claim were filed in the Sunset Hollow bankruptcy case.[12]  In its cross-claims against K&M, the Creditors' Committee asks that the Court equitably subordinate the claims of K&M and/or recharacterize their claims against Sunset Hollow as equity interests.   In support, the Creditors' Committee portrays the Acquisition as a sale of K&M's equity interests in the assets of each of the Related Debtors from which they benefitted as sellers.  It is the view of the Creditors' Committee that K&M's claims be subordinated to those of the Bank, as matter of fairness.  This would enable the Bank to satisfy its claims from the Proceeds, thus protecting the N&B Express estate, which would otherwise be liable, as a guarantor of the First Mortgage, on a deficiency claim of the Bank against Sunset Hollow.

The Creditors' Committee acknowledges that a ruling for summary judgment in favor of the Bank will moot its cross-claims.  K&M raise the same standing issues that were advanced in their opposition to approval of the Stipulation in their opposition to the cross-claims.  They do not address the merits of the cross-claims.

---

[12] The Committee maintains that since N&B Express ran the daily operations of the common carrier business, with Sunset Hollow and Sugarloaf Leasing merely providing the real estate and the rolling stock, the estate of N&B Express is the only of the three with unsecured creditors.

## III.   DISCUSSION

## A.   Motion for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56© (applicable to adversary proceedings through Fed. R. Bankr. P. 7056).  A  "genuine issue" exists if "the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party." NASCO, Inc. v. Public Storage, Inc., 29 F.3d 28, 32 (1st Cir. 1994) (emphasis in original).  A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law."  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).

## 1.   The Effect of the Subordination Agreement

The Bankruptcy Code provides that "a subordination agreement is enforceable in a [bankruptcy] case . . . to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a).[13] It is well-settled under Massachusetts law that the interpretation of a contract is generally a question of law.  Freelander v. G. & K. Realty Corp., 357 Mass. 512, 516, 258 N.E.2d 786 (1970).  Whether a contract is unambiguous, or whether it contains ambiguities, is a question of law for the Court.  Allen v. Adage, Inc., 967 F.2d 695, 698 (1st Cir. 1992).

An unambiguous instrument must be enforced according to its terms," Freelander, 357 Mass. at 516, and the "subjective contemplations" of the parties thereto are immaterial.

_____

[13] Both the First and Second Mortgages provide that Massachusetts law controls and the parties do not argue otherwise.

-15-

Blakeley v. Pilgrim Packing Co., 4 Mass.App.Ct. 19, 24, 340 N.E.2d 511, 514 (1976). Where

the instrument subject to interpretation is a subordination agreement, Massachusetts law

requires that it be "'consistently' construed to afford 'substantial practical' benefits to the

debt or security interest given priority." Rosen v. A-H, Inc., 17 Mass.App.Ct. 126, 130, 456

N.E.2d 477, 480 (1983).

The explicit purpose of the Subordination Agreement before this Court was "*to induce

[the Bank]. . . to make or continue loans from time to time, and in consideration of a loan

made or to be made or continued by the [Bank] to [Sunset Hollow] under [the Note].*"

(Emphasis supplied).  It is undisputed that the Subordination Agreement subordinates the

Second Mortgage to the Note.  The Bank is unambiguously the beneficiary of the

Subordination Agreement and, as such, this Court is obligated to construe the agreement

"to afford 'substantial practical' benefits" to the priority of the Note, rather than to the Second

Mortgage.  See id.  Nevertheless, construction skewed by case law need not be relied upon

to find in favor of the Bank. This Court finds the tortured interpretation of the Subordination

Agreement advanced by K&M simply untenable.

The Second Mortgage twice acknowledges its junior status relative to the First

Mortgage.  And in the Subordination Agreement, K&M acknowledge that their priority under

Second Mortgage is subject to that of the Bank under the First Mortgage by agreeing not

to "take any lien or security on any of [Sunset Hollow's] property at any time when the [Bank]

has any claim or claims against [Sunset Hollow] *other than a second mortgage on [Sunset

Hollow's] real estate. . . which mortgage is subject to a senior mortgage to the Lender.*"

(Emphasis supplied).  This language unambiguously notes the priority of the First Mortgage

over the Second, without any suggestion that the priorities of those mortgages were altered in any way.

K&M's suggestion that the Subordination Agreement was intended to benefit not the Bank, but K&M, would have the Court hold that, in the absence of any supporting language, the Subordination Agreement only subordinated $700,000.00 of what is otherwise an undeniably junior mortgage to a senior mortgage, and the remainder of that senior mortgage was to be subordinated to the junior mortgage. There is no basis for such a holding. The Subordination Agreement is nothing more than a "belt and suspenders" with respect to the Bank's priority. It provides further assurance that the Bank will be paid on its $700,000.00 Note, in the event of default, before K&M may collect on Sunset Hollow's liability under the Second Mortgage. K&M have offered nothing, other than bare allegations unsupported by relevant documents, to contradict  the unambiguous terms of the First and Second Mortgages and the Subordination Agreement. Nor is this Court persuaded that the Letter in some way lends credence to their position. K&M would have this Court view the Letter as proof that the Subordination Agreement subordinated the Bank to K&M rather than the other way around. There is no reason to believe that the Letter was anything other than an attempt by the Bank to once again get confirmation with respect to their priority, already well supported. Accordingly, this Court holds that the entirety of the First Mortgage has priority over the Second Mortgage.

## 2.      The Portion of the Proceeds to Which the Bank Is Entitled

This Court has determined that the Bank has priority over K&M with respect to the amount of the claim secured by the First Mortgage. The amount of that claim, however, is less certain. The Bank maintains that it is entitled to the balance of the Proceeds in order

-17-

to satisfy its claims against the other Related Debtors and Cappelli. According to the terms of the First Mortgage, Sunset Hollow guaranteed certain obligations owed by N&B Express and of Sugarloaf Leasing to the Bank at the time of the Acquisition. The Motion for Summary Judgment does not refer to any obligation owed by Sugarloaf Leasing, but instead to two obligations owed by N&B Express.[14]

The N&B Express obligations, as set forth in the Motion for Summary Judgment, represent 1) the obligation incurred at the time of the Acquisition, which was secured by a 2000 security agreement between the Bank and N&B Express (the "N&B Security Agreement") and guaranteed by Sunset Hollow under the First Mortgage, and 2) a later loan extended on March 12, 2002.[15]

The Forbearance Agreement represents that the loan extended to N&B Express on March 12, 2002 was secured by the following: the N&B Security Agreement; a commercial mortgage on property owned by Heather and Peter Mannheim; a commercial mortgage on property owned by Constance Cappelli; and an assignment of a life insurance policy on the

---

[14] Presumably, the obligations of Sugarloaf Leasing to the Bank were satisfied pre-petition. This presumption is buttressed by the failure of the Bank to file a proof of claim in the Sugarloaf Leasing case.

[15] The outstanding obligations to the Bank as of April 24, 2004, set forth in the Forbearance Agreement, were as follows:

- N&B Express owed $199,844.50 for the loan extended as part of the Acquisition; and $196,492.20 for the later loan extended on March 12, 2002.
- Sugarloaf Leasing owed $3,600.00 for an obligation that pre-dated the Acquisition; $24,999.86 for the loan extended as part of the Acquisition; and $35,889.64 for a later loan extended on February 8, 2002.
- Sunset Hollow owed $638,349.54 on the Note, executed as part of the Acquisition.
- Cappelli owed $913,581.24 on the Cappelli Personal Loan, extended as part of the Acquisition.

-18-

life of Cappelli.  It is undisputed that the First Mortgage secures the Sunset Hollow guaranty

for the N&B Express obligation incurred at the time of the Acquisition.  Less clear is whether

either the N&B Security Agreement or the guaranty pledged by Sunset Hollow cover future

advances.  Without the benefit of having seen the N&B Security Agreement or Sunset

Hollow's  guaranty thereof, this Court cannot determine, as a matter of law, that Sunset

Hollow is liable for the March 12, 2002 loan to the Bank.

And even if future advances are secured by the N&B Security Agreement, and thus

by the First Mortgage that secures the Sunset Hollow guaranty thereof, it is not certain that

K&M's intervening lien on the Real Property would be subordinated to them.   Under

Massachusetts law, future advances, made pursuant to a dragnet clause in a senior lien

instrument, here the First Mortgage, do not enjoy priority over an intervening lien, here the

Second Mortgage, without the possibility of such priority being made explicit in the original

lien instrument.  See NAB Asset Venture III, L.P. v. Brockton Credit Union, 62 Mass.App.Ct.

181, 815 N.E.2d 606, 609 (2004).

The language of the First Mortgage provides, in relevant part, that it secures "a

certain guaranty of even date in favor of [the Bank] relative to the obligations of N&B

Express, Inc. to [the Bank] . . . and all other obligations now existing or hereafter arising of

[Sunset Hollow] to the [Bank]."  These terms do not explicitly incorporate any future advance

from the Bank to N&B Express that may or may not be guaranteed by Sunset Hollow.  In

light of NAB Asset Venture III, such language may be insufficient to subordinate the Second

Mortgage to the March 12, 2002 advance to N&B Express.[16]

_____

[16] Questions also exist with respect to the Cappelli Personal Loan.  The Motion for Summary
Judgment states that the amount owed on the Cappelli Personal Loan is $434,235.20, which has

For the foregoing reasons, there exist genuine issues of material facts related to the actual amount of that portion of the Bank's claim secured by the First Mortgage, to which the K&M claim is subordinated.

### 3.    The Marshaling Doctrine

Marshaling is an equitable doctrine that may be invoked when a senior and a junior creditor are both secured by a common asset, but where the senior creditor is also secured by some other asset, or assets, of a common debtor.  Under the doctrine of marshaling, the senior creditor is required to look first to the non-shared collateral to satisfy its claim, thereby providing the junior creditor with the opportunity to reach equity for its claim in the shared collateral.

The Supreme Court has stated that the purpose of marshaling is "to prevent the arbitrary action of a senior lienor from destroying the rights of all who have an interest in the property involved."  Meyer v. U.S., 375 U.S. 233, 237, 84 S.Ct. 318 (1963).  Massachusetts

---

not been disputed in the context of the instant action. Nevertheless, earlier and unrelated pleadings filed by the Creditors' Committee in the N&B Express and Sugarloaf Leasing cases represent that "[u]pon information and belief, the Cappelli Personal Loan was paid in full prior [to] the Petition Date." This was stated in the Committee's identical oppositions to motions to sell certain equipment of N&B Express and Sugarloaf Leasing.  The Creditors' Committee objected to the proposed distribution of the proceeds, which would have been used reduce the Bank's claims against N&B Express and Sugarloaf Leasing.  The Committee advocated for the application of the marshaling doctrine to compel the Bank to pursue its claims against Cappelli, as principal-guarantor of the debtors' respective obligations.  The Creditors' Committee argued that this would be most equitable, as Cappelli had received the benefit of having his personal obligations to the Bank paid off prior to the obligations of the Related Debtors.  Unfortunately, counsel to the Creditors' Committee failed to appear at the sale hearing, so the objections were overruled and the sales were allowed without addressing whether the Cappelli Personal Loan had, in fact, been paid.  The affidavit attached to the Bank's Motion for Summary Judgment, which represents that the Cappelli Personal Loan has an outstanding balance, was made under oath; however, the Court takes judicial notice of the existence of the Creditors' Committee's prior inconsistent pleadings without addressing their reliability. See, In re Hyde, 334 B.R. 506, 509 n. 2 (Bankr. D. Mass. 2005) (citations omitted). The discrepancy gives pause to raise an eyebrow, if ever so slightly.

courts require three conditions to be met before marshaling will be invoked: (1) there must

be two secured creditors with a common debtor; (2) there must be two funds or assets

belonging to the debtor; and (3) the senior creditor must have the right to satisfy its claim

from both of the funds, while the junior creditor must be limited to recovery from the one

shared fund.  In re Pray, 242 B.R. 205, 209 (B.A.P. 1st Cir. 1999) (citations omitted).

> There are three widely-held exceptions to the "common debtor" requirement:
>
> (1) where the nondebtor (typically a corporate debtor's controlling shareholder who has guaranteed the debt and secured the guaranty with his or her own property) is the alter ego of the debtor;
> (2) where the nondebtor's property should equitably be deemed a capital contribution to the debtor; and
> (3) where the nondebtor has engaged in inequitable conduct.

In re Borges, 184 B.R. 874, 879 n. 3 (Bankr. D. Conn. 1995).

Where the non-shared collateral is owned not by the debtor, but by a guarantor of its

debt, courts have generally held that the common debtor requirement is not met.  Broadway

Nat'l Bank of Chelsea v. Hayward, *discussed infra*, 285 Mass. 459, 462-63, 189 N.E. 199

(1934).   However, some courts have entertained an exception to that rule where the

guarantor is an officer, director, or shareholder of a corporate debtor (hereinafter, a

"guarantor-principal").   Most notably, courts in the state of Wisconsin have deemed assets

pledged by a guarantor-principal of a corporate debtor to be a capital contribution to the

debtor and, employing their view of the doctrine of marshaling, have required the senior

creditor to proceed first against the collateral provided by the guarantor-principal's personal

assets  (hereinafter referred to as the "Wisconsin Exception").  See, e.g., Moser Paper Co.

v. North Shore Paper Co., 83 Wis.2d 852, 864, 266 N.W.2d 411 (1978) (where the principals

of a corporate debtor mortgaged their homes to guaranty a corporate debt, the Court found

that "[a]lthough record title to the residences remained in the hands of [the principals], in the eyes of equity the [principals] had placed their residences in the company till") (quoting, C. Gotzian & Co. v. Shakman, 89 Wis. 52, 59, 61 N.W. 304 (1894) ("In form, [the mortgage] was a security given by a partner upon his individual property; in fact, it was a contribution to the capital of the firm")). One Wisconsin court reasoned that "[i]t is foreseeable that the person who had the most to gain if the company succeeded also takes the consequences if the company fails." In re Universal Electric Sign Co., Inc., 255 B.R. 732, 736 (Bankr. E.D. Wisc. 2000).

The Wisconsin Exception has proven to be controversial and several courts outside of Wisconsin have declined to follow its rationale. See Peoples Bank of Tuscaloosa v. The Computer Room (In re The Computer Room), 24 B.R. 732, 737 (Bankr. N.D. Ala. 1982) ("better reasoning supports the view that a separate guaranty of an officer, director, and principal stockholder is not a separate fund which the trustee in bankruptcy can force a senior creditor to exhaust"); In re Childers, 44 B.R. 23, 26 (Bankr. N.D. Ala. 1984)(citing, e.g., In re Ludwig Honold Mfg. Co., 33 B.R. 724, 727, 728 (Bankr. E.D. Penn. 1983) ("the cases that have ignored the common debtor requirement have been criticized as being based on a misapplication of the spirit behind the marshalling doctrine")); In re Derecktor of Rhode Island, 150 B.R. 296, 301 (Bankr. D. R.I. 1993) ("we find that such guarantees do not meet the 'two funds' requirement of marshaling").

In Stuhley v. U.S. Small Business Administration (In re United Medical Research, Inc.), the court refused to follow Wisconsin's lead in the absence of inequitable conduct on the part of the guarantor-principals that would mandate piercing the corporate veil. 12 B.R. 941, 943 (Bankr. C.D. Cal. 1981). The court reasoned that:

> It is poor policy for courts to upset legitimate business transactions because
> of some vague concept of equity. We tend to forget that these decisions
> affect future commercial transactions. Advantageous and proper loans to
> corporations may be frustrated because shareholders would be fearful of
> having their personal assets marshaled for corporate creditors should they
> guarantee a corporate debt.

Id. The court further supported its refusal to extend the doctrine of marshaling by analogizing a guaranty pledged by a guarantor-principal to a shareholder loan:

> Claims of majority shareholders will be subordinated when the majority of the
> shareholders have been involved in fraud, overreaching, or other inequitable
> conduct. However, absent inequitable conduct, bona fide claims based upon
> loans from majority shareholders will not be subordinated to the claims of
> other creditors. On principle there is no difference between a stockholder loan
> to a corporation and that stockholder loaning his credit to the corporation by
> securing his guarantee of a corporate debt with individual assets.

Id. at 944.

Massachusetts courts have not explicitly reached the issue presented by the Wisconsin Exception, but all evidence to date reveals that the Massachusetts view on the marshaling doctrine is conservative.

In Broadway Nat'l Bank of Chelsea v. Hayward, the Supreme Judicial Court declined the invitation to order the marshaling of assets of a guarantor, noting "'as general rule at any rate, [marshaling] is not to be applied where the two funds to which the creditors or sets of creditors may resort are not derived from a common source, or are not in the hands of a common debtor.'" 285 Mass. at 462-63 (1934)(quoting Carter v. Tanners' Leather Co., 196 Mass. 163, 166, 81 N.E. 902 (1907).

More recently, a bankruptcy judge in this district declined to order the marshaling of assets owned by a corporate guarantor of a corporate debtor, where that guarantor was under common ownership with the debtor. Whitlock v. Max Goodman & Sons Realty, Inc.

(In re Goodman Industries, Inc.), 21 B.R. 512 (Bankr. D. Mass. 1982).  The Court

acknowledged the existence of "a conflict as to the treatment of guarantors" under the

doctrine of marshaling, but noted that:

> [T]he prevailing view is that the sine qua non of marshalling is that the senior
> creditor have access to two funds of a single debtor when only one fund is
> subject to the claim of a junior creditor. . .   The facts of this case do not
> present a compelling equitable rationale for this Court to accept the deviation
> from the traditional marshalling doctrine of a single debtor that would be
> required to extend the doctrine to a guarantor.

Id. at 523 (citing, inter alia, Hayward, supra, 284 Mass. at 463).[17]

Except for the common debtor requirement, the traditional requirements for

marshaling are seemingly present in the case before this Court.  There are two secured

creditors, the Bank and K&M, secured by a common asset of Sunset Hollow, the Proceeds.

The Bank has the right to satisfy its claim from the Proceeds or from the assets pledged by

the Related Debtors and the Principals, while K&M are limited to recovery from the

Proceeds.   But with respect to the three traditional common debtor exceptions, there has

been no allegation that either of the other Related Debtors should be considered the alter

---

[17] The Court in Goodman Industries had been asked to find that the debtor and the nondebtor-guarantor "were, in reality, operating as a single unit and therefore, all of [the non-debtor-guarantor's] assets should be included in the bankruptcy estate. Id. at 522.  The Court refused to treat the two corporations as one absent "any fraudulent or injurious consequence" of their relationship or "evidence that any third party was mislead or confused by the separate identities of the two corporations."  Id.  This finding of fact was folded into the marshaling discussion and it seems that the Court was persuaded that, without more, a nondebtor-guarantor should not be liable for the primary obligations of a debtor where the two were separate corporations.  See id. at 523 (prior to refusing to marshal the nondebtor's assets, the Court notes "[a]lthough the Trustee argues that [the non-debtor] and [the debtor] should be treated as the same entity, I have specifically declined to so find").  Goodman Industries is distinguishable from cases where the Wisconsin Exception has been adopted because the guarantor was not an individual officer, director, or shareholder, but a separate, though related, corporate entity.

ego of Sunset Hollow, nor do the facts now before the Court persuasively support any viable

allegation of inequitable conduct on the part of any of those corporate guarantors.[18]

There is no evidence that Massachusetts courts would apply the controversial

Wisconsin Exception, much less expand it to include guarantors who are not guarantor-

principals, but are instead related corporate bankruptcy debtors.  As in <u>Goodman Industrial,</u>

<u>Inc.</u>, there is nothing before this Court to suggest that creditors were misled into believing

that the Related Debtors were, in fact, one single entity.  <u>See</u> <u>In re Goodman Industrial, Inc.</u>,

21 B.R. at 522.  Nor have facts been presented indicative of any "fraudulent or injurious

---

[18] K&M did suggest that the Bank, the Related Debtors, and Cappelli conspired to further an alleged "agenda" to pay the Bank from the Proceeds "so that funds could be available to pay N&B [Express] and Sugarloaf [Leasing] claims [for] which Cappelli will be personally liable and to pay Cappelli's personal obligations to [the Bank]."  K&M also contend that the Bank engaged in egregious conduct by not applying the proceeds of accounts receivable, held at the Bank by N&B Express, towards N&B Express debt.  With respect to the alleged conspiracy, each of the outstanding obligations to the Bank are cross-collateralized and cross-guaranteed, including those secured by the First Mortgage.  Cappelli will remain liable for each of those obligations for which the Bank is not fully repaid.  As for the alleged egregious conduct by the Bank, it is typically inequitable conduct on the part of the *guarantor* that will permit an exception to the common debtor requirement, not inequitable conduct on the part of the senior creditor.  <u>See</u>, e.g., <u>In re Tampa Chain Co., Inc.</u>, 53 B.R. 772, 770 (Bankr. S.D. N.Y. 1985) (guarantor-principal subject to marshaling "where the evidence amply demonstrates highly inequitable conduct by the shareholders/guarantors").

K&M cite <u>Charles Construction Co., Inc. v. Leisure Resources, Inc.</u>, 1 Mass.App.Ct. 755, 760-61, 307 N.E.2d 336, 339-41 (1974), in support of their position that the inequitable conduct of a senior creditor warrants marshaling.  In that case, the court subordinated a senior creditor ("A") to a junior creditor ("B") after A intentionally released an insurance company from liability on a claim.  <u>Id.</u>  In doing so, A effectively dissipated funds that would otherwise have been used to satisfy its own and junior claims.  A then was able to claim a first security interest in an escrow fund, the remaining asset of the debtor, that had been originally established for the benefit of B.  <u>Id.</u>  Because A participated knowingly in the destruction of a part of the security interest of B, the court subordinated its rights to the escrow account to the rights of B.  Though based on the underlying principles of the marshaling doctrine, the court, in effect, equitably subordinated the rights of A to B in a single fund.  <u>Charles Construction</u> is therefore inapposite, as it relates to an exception to the requirement that a creditor have access to two funds to satisfy its claim, rather than an exception to the "common debtor" requirement at issue here.  And furthermore, it has not been alleged that the Bank has overtly acted to destroy the security interest of K&M, other than to refuse to pursue collection of its collateral in a fashion which would benefit K&M.

consequence" of the relationship between Sunset Hollow, N&B Express and Sugarloaf

Leasing that would otherwise justify treating the three corporations as one.  See id.

Accordingly, there is no sound basis for the application of the marshaling doctrine.


**B.     Standing of the Creditors' Committee**

Section 1109(b) of the Bankruptcy Code provides:

> A party in interest, including the debtor, the trustee, a creditors' committee, an
> equity security holders' committee, a creditor, an equity security holder, or any
> indenture trustee, may raise and may appear and be heard on any issue in a
> case under this chapter.

11 U.S.C. § 1109(b).  The term "creditor" includes "an entity that has a claim against the

debtor that arose at the time of or before the order for relief concerning the debtor." 11

U.S.C. § 101(10)(A).  And a "claim" is defined, in relevant part, as a "right to payment,

whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent,

matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11

U.S.C. § 101(5).

Guarantors of an obligation of a debtor in bankruptcy hold contingent claims against

that debtor's estate.  Smith v. Cunningham (In re Cunningham), 163 B.R. 657, 660 (Bankr.

D. Mass. 1994) (citing, *inter alia*, D'Onofrio Constr. Co. v. Recon Co., 255 F.2d 904, 906-09

(1st Cir. 1958) ("Even though a cause of action for contribution does not become complete

until the claimant pays more than his equitable share of the common liability, an inchoate

right to compel contribution comes into being and becomes the property interest of a joint

tortfeasor or co-obligor when the common liability arises")).  Accordingly, such guarantors

are "creditors" of the debtor.  See Travelers Ins. Co. v. Cambridge Meridian Group, Inc. (In

-26-

re Erin Food Servs.), 980 F.2d 792, 796 (1st Cir. 1992) (the personal guarantor of an

obligation of the debtor "held a contingent unsecured claim against the debtor").   The

Related Debtors have obligations to secured parties that are cross-collateralized and cross-

guaranteed by each debtor's estate.  As such, each one is a creditor with a contingent claim

against the estate of the others and each is a party in interest to actions that effect the funds

available to creditors of the other estates.

The Related Debtors are each acting as a debtor-in-possession.  Typically, it is a

debtor-in-possession that is charged with the pursuit of actions that are in the best interest

of a bankruptcy estate, but courts have held that "a debtor in possession may stipulate to

representation by an unsecured creditors' committee 'so long as the bankruptcy court

exercises its judicial oversight and verifies that the litigation is indeed necessary and

beneficial.'"  Commodore Int'l Ltd. v. Gould et al, (In re Commodore Int'l Ltd.), 262 F.3d 96,

98 (2nd Cir. 2001) (quoting, Liberty Mut. Ins. Co. v. Official Unsecured Creditors' Comm. of

Spaulding Composites (In re Spaulding Composites Co.), 207 B.R. 899, 904 (B.A.P. 9th Cir.

1997).   The Second Circuit has adopted a two-prong test, originally articulated by the

Spaulding Composites court, to determine whether a committee of unsecured creditors has

standing to pursue claims on behalf of a debtor:  (1) the committee must have the consent

of the debtor in possession, and (2) the court must find that suit by the committee is (a) in

the best interest of the bankruptcy estate, and (b) is "necessary and beneficial" to the fair

and efficient resolution of the bankruptcy proceedings.  In re Commodore Int'l Ltd., 207 B.R.

at 100.

In the instant action, while the question of marshaling was unanswered, N&B Express

easily had standing to be heard with respect thereto.  And the Creditors' Committee had

standing to represent the interest of creditors as well.  Its authority to do so was not

contingent upon the approval of this Stipulation, but was granted by this Court's order of

February 27, 2006.

The Stipulation before the Court, however, goes further.  It authorizes the Creditors'

Committee of N&B Express to bring *any and all* claims on behalf of any of the Related

Debtors against the Insiders.  But the Creditors' Committee's lacks standing to prosecute

claims on behalf of the estates of either Sunset Hollow or Sugarloaf Leasing. Claims brought

on behalf of Sunset Hollow against the Insiders would not benefit the N&B Express estate

inasmuch as the deadline for filing claims in the Sunset Hollow case has passed, and N&B

Express filed no claim therein.[19]  Nor did N&B Express file a claim in the Sugarloaf case.

Only in the N&B Express does the Committee have standing - the standing derived from the

N&B Express debtor passed on to its Creditors' Committee.

## IV.    CONCLUSION

For all of the foregoing reasons, the "Motion of the Bank of Western Massachusetts

for Summary Judgment" is GRANTED IN PART, insofar as the Court finds that the terms

of the Subordination Agreement does not subordinate the Bank's First Mortgage to the

Second Mortgage and insofar as the Court rules that the marshaling doctrine is inapplicable,

and DENIED IN PART, with respect to the amount of the claim secured by the First

---

[19] The failure of N&B Express to file a proof of claim in the Sunset Hollows case is without consequence on its standing to prosecute claims involving the distribution of the Proceeds.  See In re Abijoe Realty Corp., 943 F.2d 121, 125 (1st Cir. 1991) (citing In re Stamford Color Photo, Inc., 105 B.R. 204, 206-07 (Bankr. D. Conn. 1989)) (holder of a claim, who failed to timely file a proof of claim, was "not entitled to share in distribution but nonetheless enjoyed § 1112(b) standing as 'creditor,' with 'right to payment'").

Mortgage, to which the holders of the Second Mortgage are subordinated; the "Defendants John Kokoski and Paul A.L. Mannheim's Motion to Dismiss Cross-Claims of Official Committee of Unsecured Creditors for N&B Express" is DENIED; and the "Joint Motion to Approve Stipulation Authorizing Official Committee of Unsecured Creditors of N&B Express, Inc. to Prosecute Certain Claims on Behalf of the Estates of N&B Express, Inc., Sugarloaf Leasing Corporation and Sunset Hollow Properties" is GRANTED IN PART, insofar as the Creditors' Committee may prosecute claims held by N&B Express, and DENIED as to the remainder of the Stipulation.  Separate orders will issue in conformity with this Memorandum of Decision.

By the Court,

DATED:      January 3, 2007         _____
                                    Henry J. Boroff
                                    United States Bankruptcy Judge